527 A.2d 595

Christopher P. Markley, et al. *v.* Carlisle Zoning Hearing Board and Helen H. Stevens Community Mental Health Center. Helen H. Stevens Community Mental Health Center, Appellant.

Christopher P. Markley, et al., Appellants *v.* Carlisle Zoning Hearing Board and Helen H. Stevens Community Mental Health Center, Appellees.

Argued April 20, 1987, before Judges CRAIG and PALLADINO, and Senior Judge BLATT, sitting as a panel of three.

*Marcus A. McKnight, III, Irwin, Irwin* & *McKnight,* for Mental Health Center.

*Charles E. Zaleski, Tive, Hetrick & Pierce, P.C.,* for Intervenor Markley, et al.

OPINION BY JUDGE CRAIG, June 12, 1987:

In these consolidated appeals, intervenor Helen H. Stevens Community Mental Health Center (center) appeals an order of the Court of Common Pleas of Cumberland County which reversed the decision of the Carlisle Zoning Hearing Board and concluded that the center's proposed operation of a community residential rehabilitation service (CRRS) program for mentally disturbed individuals in an apartment building in a residential district would change the use of that building from that of an "apartment building" to a "convalescent home," which would constitute a prohibited change of the legal non-conforming apartment use.

In their precautionary cross-appeal, Christopher Markley and other citizens (citizens' group) contest the trial court's conclusion that the program's clients occupying each dwelling unit would live independently of each other.

Where the trial court, in reviewing a zoning appeal has taken no evidence beyond that presented to the zoning hearing board, the Pennsylvania Supreme Court has stated that:

> [T]he scope of our review is limited to determining whether the Board committed a manifest abuse of discretion or an error of law. . . . (Citations omitted.) We may conclude that the Board abused its discretion only if its findings are not supported by substantial evidence, 53 P.S. §11010 (1972) [Pennsylvania Municipalities Planning Code §11010]; 2 Pa. C. S. §754(b) [Local Agency Law] (citations omitted). By 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion. (Citations omitted.) Valley View Civic Association v. Zoning Board of Adjustment, 501 Pa. 550, 554-55, 462 A.2d 637, 639-40 (1983).

The policy objective of the CRRS program, briefly stated, is to assist persons with chronic psychiatric disability to live as independently as possible by providing training and assistance in the skills of community living. The CRRS program pursues those objectives through:

(1) A homelike, noninstitutional environment providing maximum opportunity to learn the skills necessary for more independent living.

(2) A residential setting providing each client with maximum possible autonomy, independence, and self-determination.

(3) A program which constantly strives to enable clients to move to less restrictive living settings.

(4) Responsible staff to support and assist the client as needed in his movement to independence.

(5) Well-developed cooperative efforts with other agencies in the service delivery system to ensure coordinated, continuous and effective services for the rehabilitation of clients.

55 Pa. Code §5310.2(a), (c).

According to the trial court, which adopted the board's findings of fact, the center proposes, by lease, to take eight of the fourteen dwelling units at the Bellaire Apartments and place nineteen of its clients in seven of the dwelling units, while using one unit as an administrative office for staff personnel. Additionally, the trial court found that the administrative office would be staffed by at least one person twenty-four hours per day, but no staff person would reside in that apartment. The

office would be used for record storage, as a social and meeting area for clients,[1] and for medication storage.

The area in which the Bellaire Apartments are located is zoned R-4 High Density Residential. Although an apartment building is not a permitted use in that district under the borough zoning ordinance, the Bellaire Apartments building constitutes a pre-existing nonconforming use. Under section 311(4) of the Borough of Carlisle Zoning Ordinance, "a nonconforming use may be changed only to a conforming use; it may not be changed to another nonconforming use". Therefore, in order to establish the CRRS program at the Bellaire Apartments without resorting to an application for a variance, which the center sought in the alternative, the center's burden was to establish that, notwithstanding the establishment of the CRRS program at the Bellaire Apartments, the use of that structure would continue to be that of an "apartment building".

"Whether a proposed use, as factually described in an application or in testimony, falls within a given category specified in a zoning ordinance is a question of law and subject to review on that basis." *Appeal of Ethken Corp.*, 89 Pa. Commonwealth Ct. 612, 616, 493 A.2d 787, 789 (1985).

---

[1] Among the physical plant requirements promulgated by the Department of Public Welfare,

> (a) Each community residential rehabilitation service (CRRS) must have at least one furnished room available for the purpose of counseling and meeting. The room must assure privacy for participants in the counseling sessions or meetings, but may be a room generally used for other purposes. The room may not be a client or staff bedroom.

55 Pa. Code §5310.73(a).

### Independent Living

Under section 202(2) of the Borough of Carlisle Zoning Ordinance, "apartment building" is defined as:

a building arranged, intended or designed to be occupied by three or more families *living in dwelling units, independently of each other,* but excluding conversion and garden apartment buildings and multi-family dwellings. (Emphasis added.)

In applying that definition to the present facts, the trial court agreed with the zoning hearing board's conclusion that the occupancy of the CRRS clients in the Bellaire Apartments constituted the equivalent of families living in dwelling units independently of each other. However, by virtue of the precautionary cross-appeal by the citizens' group, we must address their contention that the proposed program would not constitute the equivalent of family units living independently of each other.

On the issue of independent living, the trial court noted the assertions by the citizens' group that the units are interdependent because the CRRS program involves twenty-four hour staff supervision, assistance in menu planning and distribution of medication, potential changes in the assignment of clients as apartment-mates and a leasing arrangement which would be between the apartment management and the center, not between the apartment management and the individual clients.

However, the trial judge focused on the absence of inter-relationships among the individual units, noting that each would include its own eating and sleeping area and that clients of each would engage in different occupations and social and rehabilitative programs, thus necessitating daily schedules which would each be independent of those of other participants in the program. Accordingly, although the clients receive some assistance from center personnel, that assistance is not rele-

vant to the inquiry of whether the clients in each dwelling unit live independently of each other. Certainly, the acitivity of occasional gatherings of some or all of the program's clients for social functions differs little from the practice of many apartment dwellers of meeting with other residents for social occasions.

The present case is analogous to *Philadelphia Center for Development Services v. Zoning Hearing Board of Plymouth Township,* 89 Pa. Commonwealth Ct. 591, 492 A.2d 1191 (1985). In that case, this court concluded that a community living arrangement (CLA) for mentally retarded citizens was a permitted use as a single-family residence within the township's residentially zoned districts because the CLA residents constituted a "family" as defined by the ordinance.

Each CLA housed three non-related, mentally retarded citizens in a supervised, residential home atmosphere designed to assist them in adjusting to mainstream society. In each CLA, two daytime and one overnight staff member assisted the residents with housekeeping, cooking and other daily living activities. Additionally, supervisory personnel made several weekly visits, but no staff members actually resided at a CLA.

In that case, although this court was not required to determine specifically whether a CLA constituted an *independent* family unit, our decision, which likened the role of staff members to that of a "non-resident housekeeper, maid or gardener who performs services for the occupants of a home," in effect treated a CLA as an independent living arrangement; we affirmed the trial court's rejection of the township's suggestion that a CLA was more like an institutional use.

We therefore conclude that the trial court committed no error of law in concluding in this case that the "family units" within the building live independently of each other.

## Staff Office as an Accessory Use

The trial court next concluded that, because one of the apartments within the Bellaire Apartments would be used by employees of the center as a staff office, it would not be used as a dwelling unit, and that element would change the nature of the entire building.

Clearly the staff apartment would not constitute a dwelling unit as contemplated by the ordinance because, although physically similar to the clients' apartments,[2] it would not serve as a residence. Therefore, the staff apartment must qualify as a use accessory to the primary use of apartment building in order for the CRRS program, as proposed, to occupy the Bellaire Apartments.

At section 202(2), the ordinance defines "accessory use" as a use which is:

clearly incidental to, and customarily found in connection with, a particular principal use.

That definition is consistent with this court's traditional construction of the term. In *Food Bag, Inc. v. Mahoning Township Zoning Board of Adjustment*, 51 Pa. Commonwealth Ct. 304, 309, 414 A.2d 421, 423 (1980), we stated that, "[a]ppellant must prove that the use sought is secondary to the principal use and is usually found with that principal use."

However, this court is unable to assess whether the staff apartment meets those two criteria because the board did not set forth findings of fact on those points, as required by section 908(10) of the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10908(10), and the trial court did

---

[2] The Active Care Coordinator of the center testified that the staff apartment is furnished like any other apartment and is maintained to serve as a model of what an apartment can look like.

not fill that void with its own findings.[3] As we stated in *Hess v. Upper Oxford Township,* 17 Pa. Commonwealth Ct. 399, 403, 332 A.2d 836, 838-39 (1975),

> This Court will not rummage through the record, speculating upon the credibility and weight of the evidence before a finder of fact. Nor will we, with one hat on, make our own findings, and then don our appellate hat to determine whether our decision can be sustained.

Among its conclusions of law, the board did indicate that the use of one unit for staff is analogous to the situation in a large apartment building unit, where a superintendent resides, monitoring the building's physical and mechanical plant. However, we note discrepancies between the board's example and the present situation. In the present case, no staff member *resides* in the office, and the monitoring performed by the staff is of the clients and their daily activities, not of the apartment building itself.

The pivotal issue, as raised by the center, remains whether the staff unit constitutes an accessory to the apartment building so that the building remains a legal nonconforming use. Pertinent to that issue, we note that the staff apartment could be legally categorized as an "office". However, this court does not have before it the zoning ordinance definition of "office", which is necessary to make that determination. Nor has a finding of fact been made as to whether the staff unit does in fact constitute an office.

Accordingly, we must remand for findings of fact as to whether (1) the staff unit constitutes an "office", and if

---

[3] Section 1010 of the MPC, 53 P.S. §11010, provides that the trial court may make its own finding of fact, based upon the record below, as supplemented by additional evidence, where the board has failed to make the necessary findings. *Hess v. Upper Oxford Township,* 17 Pa. Commonwealth Ct. 399, 332 A.2d 836 (1975).

so, (2) whether that use is "clearly incidental to", and (3) "customarily found in connection with",[4] an apartment building as the particular principal use here, consistent with the ordinance definition of "accessory use."[5]

We therefore remand to the trial court, which may elect to remand the case to the zoning hearing board to make the specified findings, taking additional evidence if necessary, or the trial court itself may make those findings, as permitted by section 1010 of the MPC, 53 P.S. §11010.

---

[4] In *Klein v. Township of Lower Macungie,* 39 Pa. Commonwealth Ct. 81, 395 A.2d 609 (1978), the ordinance defined an accessory use as one which is "customarily incidental to the permitted use". Focusing specifically on the ordinance's phrase, "customarily incidental", Judge ROGERS of this court asked, "[d]oes this language refer to a use which is customary on residential properties or does it have reference to a use which, when present, is usually not the main use but incidental, secondary, or accessory to some other use?" Judge ROGERS concluded that the ordinance drafters must have intended that the language referred to uses which are usually incidental to a main use, noting that "customarily" modified "incidental", and that "there was no requirement that a use be a customary one." However, the present ordinance, which requires that the accessory use be "customarily found in connection with a particular principal use", appears to be of the type that Judge ROGERS referred to in the first half of his question—that is, is the present staff office use one which is customary in an apartment building?

[5] In *Green v. Zoning Board of Adjustment of the City of Pittsburgh,* 88 Pa. Commonwealth Ct. 469, 490 A.2d 488 (1985), the landowner sought to establish that his use of an office for his dental practice within an apartment building which he owned constituted an accessory use to the building's residential use. Because this court first concluded that the landowner failed to establish that a dental office is customarily incidental to an apartment building, we did not decide whether the dental office was in fact incidental to the principal residential apartment building use.

After those findings have been made, the trial court will be able to redetermine whether the staff unit constitutes an accessory use.

Only if that possibility is negated can this court reach the potential remaining issues of whether the center's proposed use would be a permitted use within the borough's Institutional District, so that the center's alternative claim of exclusionary zoning would be refuted.

## ORDER

NOW, June 12, 1987, the order of the Court of Common Pleas of Cumberland County dated April 23, 1986 at No. 85 Civil 1986 is vacated and the case is remanded to the trial court, which may elect to remand the case to the zoning hearing board to make additional findings, taking additional evidence if necessary, on whether the staff unit (1) constitutes an office, and, if so, (2) whether that use is "clearly incidental to", and (3) "customarily found in connection with", an apartment building. In the alternative, the trial court itself may make those findings.

Jurisdiction retained.

Judge PALLADINO dissents.